[No. 2851.]

## Jack Hancock *v.* The State.

1. An Accomplice is one who is not present at the commission of an offense, but who, before the act is done, advises, commands or encourages another to commit the offense.

2. Same—Indictment.—See the statement of the case for an indictment *held* sufficient to charge the defendant as an accomplice to murder in the first degree.

2. Practice—Evidence.—To obviate a continuance by the State, the defense agreed that the State should read in evidence the testimony given by two witnesses on the previous trial of the defendant's principal, as their testimony is embraced in the published report of that trial. *Held*, that such report was admissible as evidence by virtue of the agreement; that the agreement amounted to a waiver by the defendant of his right to be confronted by the witnesses against him, and that it was within his power to waive that or any other of his legal or constitutional rights, except his right of trial by jury.

Appeal from the District Court of Lamar. Tried below before the Hon. R. R. Gaines.

Joe Spears, a citizen of Lamar county, Texas, was assassinated at his home, on the Greenville road, about one and a half miles from the city of Paris, in said county, on the night of January 11, 1881. Isham Scott was indicted and tried for his murder, and has since suffered the extreme penalty of the law under a verdict of murder in the first degree with that penalty attached. The indictment in this case was presented on the ninth day of October, 1882, and, alleging the complicity of the appellant in the assassination of Spears, charged him as an ac-

complice to murder in first degree. His trial, which was had at the April term, 1883, of the Lamar county District Court, resulted in his conviction of that offense, and his punishment was affixed at a life term in the penitentiary. His motion for new trial was overruled, and he prosecuted this appeal.

The case of Isham Scott, as principal in this offense, will be found reported on 594 *et seq.* of the twelfth volume of these Reports. The witnesses who testified for the prosecution upon that trial, save the two whose testimony as it appears in the Report was read by agreement of the parties, were produced by the State upon this trial and testified substantially to the same facts. The additional testimony adduced upon this trial is summarized below.

A. J. Ulmer, city marshal of Paris, testified, for the State, that he was present in J. C. Hodges's office one night when the defendant was there. Witness went with Hodges to the defendant's house the same night, and watched that house until after eleven o'clock for the defendant, but he did not return. Witness saw the defendant in Paris next morning. He said that he went direct home the night before from Hodges's office. Witness and Hodges did not wake up the defendant's family. There was no light in defendant's house. Hodges and witness left the office of the former, going to the defendant's house, about nine o'clock that night. They left the defendant at the office in company with John A. Gose, Wm. Gullick and H. B. Birmingham. They, witness and Hodges, went to defendant's house in a gallop, stopping at Hodges's house a few moments.

In addition to his testimony on the trial of Isham Scott, J. C. Hodges testified that about January 27, 1881, he received information that the defendant knew something about the killing of Joe Spears, and he and Mr. John A. Gose went to the defendant's house, called him out and told him that they wanted him as a witness at the court house. They talked to the defendant about the killing of Joe Spears, and the defendant said that it was strange that any one would kill Joe Spears. Witness, defendant and Gose returned to the witness's office, and, with Gullick, Birmingham and others, talked to the defendant about the killing of Spears. They asked him if Green Gibson and Eli Pennington should swear that they knew who killed old Joe Spears for his money, would he believe them. He said in reply to that question that he would not even believe Captain Adams and the witness should they swear to such statement. The

witness and Ulmer then left the defendant at the office with Gose and others, and went to the defendant's house and waited and watched for the defendant two or three hours, but he, defendant, did not return to his house.

Cross-examined, the witness admitted that he, Gose and others were playing detective on the defendant at the time spoken of, to ascertain, if possible, who killed Spears. They wanted to find out what, if anything, the defendant knew about the killing, and talked to him as though they had no suspicion of his connection with it. Defendant was not then under arrest, nor was there any case pending in court in which he was a witness. Witness, Gose and others deceived him for the purpose of getting information. Witness did not then know that George Adams or Isham Scott had anything to do with the crime, or, in fact, that such men as Adams and Scott were in that county. He had heard of Scott being charged with burglary several years before.

William Gullick testified, for the State, that he was present with Ulmer, Gose, Hodges and Birmingham at Hodges's office on the night that the defendant was there in consultation about the killing. They talked to the defendant about the killing. Witness was then a policeman and the defendant knew it. Hodges and Ulmer left the office first. Defendant left it about one hour later, and said that he was going direct home.

Green Gibson, a witness for the State, testified as follows: "I remember the time of the killing of Joe Spears. I lived in Paris. I recognize Jack Hancock (defendant) in court. I saw Jack on the Sunday before the Monday of the killing. I had a talk with him about money old man Spears had. Jack asked me if I wanted some money, and said that we could go down, and while one of us held Joe the other could get the money. It was on Sunday when we had this conversation. He, Jack, said that old man Spears went into the house to get a knife to scrape a hog, and that he, Jack, took a one-dollar bill out of Spears's coat pocket, and left the balance of the money in the pocket. I saw Jack before the killing, and had another conversation with him on Monday at the hay stack, off of which I fell. Jack said I ought to have my 'G–d d—d neck broken,' and asked where I was the night before, why I did not come back, and where I would be that night. I replied that 'I may be in Jefferson or hell—I don't know which.'"

Eli Pennington testified, for the State, as follows: "I know

Jack Hancock.  Joe Spears was killed in this county, between the first and the tenth days of January, 1881.  I saw Jack Hancock some twelve or fifteen days before the killing of Spears, in a saloon, and took a drink with him, after which we went out together.  Jack said: 'Are you a man, by G–d?  If you are a man, come and stand with me, and we can get some money out of old man Joe Spears.  He has a large roll of money.'  I said: 'Better leave old man Spears alone, or you will get some of those spears stuck in you.'  Jack said that he had tried to get Green Stacey to go with him and get the money, and that if he could get no one to go, he would go and get it himself."

Cross-examined, he testified: "No one was present when Jack and I had the conversation.  Jack was drinking.  He drank a great deal when he had money.  He had some silver money at the time.  I had never heard him talk this way before.  I told Green Stacey about this conversation one Sunday in January —the day before the killing."

A. J. Gray testified, for the State, as follows: "I know Jack Hancock, and knew Joe Spears, who was butchering for me and Deal about January, 1881.  Jack Hancock assisted Joe Spears to butcher.  We paid Joe Spears some money for a hog one week before he was killed, and Jack Hancock was present.  No others were present except myself, Deal, Spears and Hancock.  Spears then wanted to loan us (witness and Deal) his money.  I told him we did not need it, and referred him to Tom Broad, Williams and Wortham and the banks.  Jack Hancock spoke up and said:  'Lend it to Tom Broad—he is a good man.'  Spears said that he would take the money to Broad on Monday.  Jack Hancock assisted Spears to kill a beef on the Sunday before the killing."

Green Stacey testified, for the State, as follows: "I know Jack Hancock.  I heard about the time of the killing of Joe Spears.  I never saw Jack Hancock to have any conversation with him until about one week after Joe Spears was killed, when Eli Pennington came to my house and asked me if Jack Hancock had ever tried to get me to go with him to rob old Joe Spears of his money."

Cross-examined, the witness said: "It was after Jack had been at Hodges's office, and after the killing of Spears, before Eli Pennington or Jack Hancock either had any conversation with me about going to rob an old man of his money.  At this time Eli Pennington told me that Jack Hancock asked him to

go with him (Hancock) and kill Spears; but prior to the killing of Spears, Jack Hancock never came to me and asked me to go with him and kill Spears. Eli Pennington did not mention this matter to me until some week or two after the killing of Spears."

Gad Chisum testified, for the defense, as follows: "I know George Adams. I saw him last Sunday at Pete Mitchell's barber shop in Paris. George Adams told me that he did not know anything against Jack Hancock, nor did he care. He said nothing about the guilt of Jack Hancock."

George Tyson, for the defense, testified as follows: "I know George Adams and have known him about two years. I knew Isham Scott something over two years. George Adams and Isham Scott were last at my house from the twentieth to the last of January, 1881. They were there for the purpose of trading with me for meat. George Adams stayed part of the time at my house, and part of the time at a negro camp. A deputy sheriff of Red River county came along one day, and George Adams ran off into the woods. When he came back I asked why he ran off. He said that he had killed an old negro butcher at Paris, and thought the officer was after him for it. He wanted me to say nothing about it."

Cross-examined, the witness admitted that Adams was a witness against him in some theft cases, and that he did not think well of Adams. Witness had been tried in those cases and acquitted.

Stephen Grant and one Westbrook testified that the reputation of George Tyson for truth and veracity was bad.

The charging part of the indictment is as follows:

"That one Isham Scott, late of the county of Lamar, on the tenth day of January, in the year of our Lord, 1881, with force and arms, in the said county of Lamar, and State of Texas, did then and there unlawfully, wilfully, and of his express malice aforethought, and by shooting him with a gun, kill one Joe Spears, who was then and there a reasonable creature in being, and in said State of Texas, and county of Lamar.

"And said grand jury further presents that on the ninth day of January, A. D. 1881, and only a few hours before the said Isham Scott committed the felony and murder aforesaid, one Jack Hancock, who was not present at the time of the shooting and killing aforesaid, but who did, then and there, in said county and State, on said ninth day of January, A. D. 1881, before said felony aforesaid was committed, advised, commanded

and encouraged the said Isham Scott to commit said felony and murder. And so the grand jurors aforesaid present and charge that, by shooting and killing the said Joe Spears as aforesaid, the said Isham Scott did commit the crime of murder in the first degree, and that the said Jack Hancock, by his acts as aforesaid, with his malice aforethought, did commit the crime of accomplice to said murder; contrary," etc.

*J. M. Long,* for the appellant: 1. Appellant calls in question the sufficiency of the indictment presented and filed against defendant below, which indictment charges that "one Isham Scott, on the tenth day of January, A. D. 1881, did then and there unlawfully, wilfully and of his express malice aforethought, and by shooting him with a gun, kill one Joe Spears."

If we analyze this language and construe the above sentence according to grammatical rules, we find the pronoun *him* evidently refers back to Isham Scott as the person shot, instead of Joe Spears, who is charged as the person killed. Does this language charge an offense in plain and intelligible language?

2. The indictment is defective, also, in omitting the word *did* in a connection where it is material, and it should allege that Isham Scott did shoot Joe Spears with a gun and kill him instantly, or inflict a mortal wound from which wound said Joe Spears did die within a year and a day from the time said wound was inflicted. (41 Texas, 498; 26 Texas, 112; 30 Texas, 360.)

We think the indictment is defective, not only in omitting the word *did* in connection with the act of shooting, but also because said indictment does not allege when and where Joe Spears died, except that he was killed on the tenth day of January, 1881, but we are not informed whether he was killed instantly or received a mortal wound, and that he died within a year and a day from the time he was shot; and yet the court permitted Doctor Hooks to testify that he examined Joe Spears on the morning of the tenth of January, 1881, and found a mortal wound on his person, made with turkey or duck shot, and that on the eleventh day of January, 1881, Joe Spears died from the effect of said gun shot wound; to which evidence appellant objected. Now, our Supreme Court, in 41 Texas, 498, held that it should appear from the face of the indictment that death happened within a year and a day after the injuries were inflicted (see Wharton's Am. Crim. Law, sec. 1073; 1 Russ. on Crimes, 504; 4 Blackburn, 197; also the case of *Hardin* v. *The State,* 4

Texas Ct. App., 370, and authorities therein cited), in which opinion the court holds that it is necessary to allege and *to prove* that the deceased literally died within a year and a day after he received the injury. Appellant further insists that it is necessary that the indictment should allege that the party wounded died from the effect of said wound. (See 4 Texas Ct. App., 370.) Starkie says it must be averred that the wound was mortal and the party died of the wound, and this cannot be supplied by any implication or intendment whatever. (Starkie Crim. Pl., 93.) In all cases the death by the means stated must be positively averred, and cannot be taken by implication. (1 East. P. C., 343; Arch. Crim. Pl., 207, notes 2 and 3.)

The death by the means stated must be positively alleged. See 3 McCord, 190; 1 East P. C., 343; Wharton Criminal Law, section 285, and the well considered case of *Hardin* v. *The State*, 4 Texas Court of Appeals, 370, wherein all these authorities are reviewed and the common law doctrine and precedents adopted and reaffirmed by our Court of Appeals.

This indictment fails to allege that Joe Spears died instantly, or that he received a mortal wound and died of said wound afterwards. Was Spears killed on the tenth of January, 1881? The evidence shows he was shot on the tenth of January, 1881, and died the next day, being the eleventh day of January, 1881. Appellant raised this exception in the court below by excepting to the evidence, and by filing his motion in arrest of judgment, thereby endeavoring to point out and place the finger of warning on the point, but the court failed to see it, and overruled the objection to the evidence of Doctor Hooks, and permitted the same to go to the jury. Hawkins says: If the stroke is given on one day and he dies on another, it is error to charge murder on the day of the stroke. (2 Hawk. P. C., sec. 88, chap. 23; 3 Miss., 45; 39 Me., 291; 24 Miss., 358; Cro. Eliz., 739.)

Every offense consists of certain acts, done or omitted, all of which must be alleged in the indictment, and be proved as laid, and any material variance between the fact laid and the fact proven will be fatal. Is it, then, a good indictment that alleges Isham Scott killed one Joe Spears? And in 3 Texas Court of Appeals, 635, case of *Denton* v. *The State*, the court holds that there is no such an offense as assault to kill. Then can this be a good indictment? And are we authorized to transpose the words used in said indictment, so as to make it intelligible as

required by our law?  (See 7 Texas Ct. App., 619; 1 Texas Ct. App., 212; and 2 Texas Ct. App., 110.)

Now, if Joe Spears did not die on the tenth day of January, 1881, or was not killed on that day, but was wounded on the tenth and died on the eleventh, the crime was not completed until the eleventh day of January, 1881, when Spears died; and can the court, or the Legislature of Texas, under the form of the Common Sense Indictment Law, authorize the courts to expand the allegations in the indictment, and admit evidence of facts not alleged in said indictment?

Appellant further contends that the so-called Common Sense Indictment Law of 1881 is in violation of the Constitution of the United States and of the Constitution of the State of Texas, and as to appellant is *ex post facto*, and retroactive, having been passed after the commission of said offense.  Appellant further insists that said indictment and the proceedings had on his trial were in violation of the Bill of Rights, and the following constitutional guarantees to which every person is entitled in this State when prosecuted for crime:

1. He shall have the right to demand the nature and cause of the accusation against him.

2. And no person shall be held to answer for a criminal offense amounting to felony, unless on indictment of a grand jury. (Bill of Rights, sec. 10.)

3. No citizen of this State shall be deprived of life, liberty, property, or privilege, outlawed, exiled, or in any manner disfranchised, except by due course of the law of the land.  (Id. sec. 19.)

4. Nor shall any State deprive any person of life, liberty or property without due course of law.  (U. S. Const., Art. 14, sec. 1.)

What is meant by this right to demand the nature and cause of the accusation?  Is it merely the right to have a copy of whatever written charge may have been filed in the court against him?

Is it met and satisfied by a pleading which does not state the material elements of the offense for which he is to be tried? Does it permit him to be convicted upon an indictment which does not allege the facts or circumstances which would render him guilty of that offense?  If not, why not?

Because the law has always required such a certain description of the offense for which he is to be placed in jeopardy, and

statement of the facts by which it is constituted, as will fully identify the charge against him, lest the grand jury should find a bill for one offense, and the defendant be put upon his trial for another, without any authority and without his knowing what crime he is required to answer, or being prepared with his evidence to meet the charge, and in such manner that the record of his conviction or acquittal would insure his subsequent protection against another prosecution on the same ground; and because this right is incompatible with any power of a Legislature to dispense with any material allegations in the indictm·nt requisite to describe and identify the particular offense with that degree of certainty which will enable the accused and the court to know that the offense for which he is put upon his trial is the same offense with that for which he stands indicted, in order that he may plead in bar a previous conviction or acquittal. The constitutional right guarantees this degree of certainty in every indictment. (24 Miss., 594; 4 George, Miss., 383; also 6 Texas Ct. App., 347.) Then has the Legislature the authority and power under the Constitution to so change the form of an indictment in a murder case, as they have attempted to do by the law adopted March, 1881, and in violation of the constitutional right to demand the nature and cause of the accusation?

In *The State* v. *Duke*, 42 Texas, 461, Gould, J., says: "But, being essential parts of the description of the offense, a statute authorizing their omission would be in violation of the constitutional right to be exempt from answering any criminal charge but on indictment and information, and of the constitutional guaranty that no citizen of this State shall be deprived of life, liberty, etc., except by due course of the law of the land;" citing the following authorities: 25 Texas, 722; 47 Maine, 436; 24 Mississippi, 390; 26 Mississippi, 637; 33 Mississippi, 373; 24 Alabama, 672.

In *The State* v. *McCormick*, 22 Texas, 301, it was held to require a statement of everything which it is necessary to prove; and this was repeatedly reaffirmed by our Supreme Court. (*Alexander* v. *The State*, 29 Texas, 475.)

There must be such an indictment, so accusing the defendant of the very crime of which he is convicted, to sustain the judgment, and the want of it will not be supplied by one charging another offense by allegations which do not include that for which the party is convicted.

Appellant adopts the legal and constitutional opinion of Jus-

tice Hurt in the celebrated case of *Huntsman* v. *The State,*
embracing authorities quoted to support said opinion, which we
invoke in behalf of appellant in this case.   (12 Texas Ct. App.,
625.)

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.   "An accomplice is one who is not
present at the commission of an offense, but who, before the act
is done, advises, commands or encourages another to commit
the offense," etc.   (Penal Code, Art. 79.)

Appellant was indicted as an accomplice of one Isham Scott
in the murder of one Joe Spears.   Scott had been indicted in a
separate indictment for the murder, and was tried and convicted,
and his case affirmed on appeal in this court.   (12 Texas Ct.
App., 594.)   In his motion to arrest the judgment, defendant
called in question the sufficiency of the indictment; and in a
very able, ingenious and exhaustive printed brief, which we
have maturely considered, his learned counsel insists that the
indictment is not explicit in sufficiently alleging the time of the
death of Spears, the party averred to have been murdered.   If
his propositions were new, and were matters to be determined
as of first impression, we might, in view of the persuasiveness
of his argument, feel required to discuss the points raised; but
the same questions have been frequently brought in review and
heretofore decided, and so we do not feel obligated to go over
and discuss them anew.   Suffice it to say that under the pre-
vious authorities and decisions the indictment is good.

In order to obviate a continuance of the case by the State, de-
fendant agreed that the prosecution might read as the evidence
of the two absent witnesses their testimony given on the trial of
Isham Scott, as the same was found reported in the case of *Scott*
v. *The State,* 12 Texas Court of Appeals, 594; which, under the
agreement, was read as reported by the prosecution.   This is
complained of as error, it being insisted that such evidence read
from the reported case of Scott was illegal.   We do not think so.
Defendant agreed to the admission of the testimony, and but for
his agreement, doubtless it would never have been offered in this
shape.   He cannot be heard to complain where he was a party
to, and where his own action brought about, the very matter of
which he complains.   He could waive the presence of the wit-
nesses if he so desired, and agree that if present they would swear
z

as they had previously done. In fact, he could waive any right guaranteed him by the Constitution and laws, except the right of trial by jury. (Code Crim. Proc., Art. 23.)

Several objections are urged to evidence admitted, and numerous supposed errors are pointed out with regard to the charge of the court. None of these errors are, in our opinion, established. In the admission of evidence the court seems to have violated no well established rule of law, and the charge, in our opinion, presented in a most clear, satisfactory and explicit manner the law applicable to all the material phases of the case. Defendant has had a fair and impartial trial. As shown by the evidence, he suggested, planned, and encouraged the murder, if he was not actually present and participating in it, of an old man in whose employ he had been, and who in his dying moments seems to have had unbounded confidence in his honesty and integrity; whilst it appears that his motive was the basest and most despicable, viz., to obtain part of the little sum which the deceased had, by hard labor, succeeded in laying up from his daily occupation. Defendant has had his rights accorded him under the law, and if guilty, as the jury and court below have found that he was, and upon evidence which, in our opinion, warranted the finding, he cannot complain of the punishment.

We find no error in the record, and the judgment is affirmed.

*Affirmed.*

Opinion delivered June 9, 1883.